**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


Mr. G. and Ms. K.


            v.                          Civil No. 04-cv-188-PB

Timberlane Regional School District


**<u>REPORT AND RECOMMENDATION</u>**


    Plaintiffs are the parents of Elenora G. ("EG"), a 14-year-old student who qualifies for special education services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 <u>et</u> <u>seq.</u>  They filed this action on May 18, 2004 appealing four due process hearing decisions pertaining to EG's IEP and placement during the 2003-2004 school year.

    Plaintiffs move for injunctive relief requesting that the court order Defendant Timberlane Regional School District ("Timberlane") to (1) implement the last agreed-upon Individualized Educational Program ("IEP") and (2) end an "illegal suspension" of EG from the Learning Skills Academy ("LSA"), a private special education school located in Rye, New Hampshire.  <u>See</u> Document No. 133.  Timberlane objects.

    The Court held an evidentiary hearing on Plaintiffs' motion

on April 19, 2006.  Ms. K., Lisa McManus, LSA's Education Director, Marcus Mann, LSA's Executive Director, and Mark Walsh, LSA's Intervention Coordinator, testified.  Both parties introduced exhibits.  As discussed below, Plaintiffs' motion should be denied for at least three reasons.  First, Plaintiffs did not exhaust their administrative remedies before seeking relief in this court.  Second, even if Plaintiffs' claims have been properly presented, Plaintiffs have not demonstrated that an injunction would redress the harm that they have alleged.  And third, Plaintiffs have not demonstrated that they are likely to succeed on the merits.

<u>Background</u>

I.   <u>December 2005 Due Process Hearing Decision</u>

The last IEP for EG that was agreed upon by the parties is dated January 14, 2003.  Pls.' Ex. 2.  It was developed while EG was enrolled as a student at the Timberlane Middle School.

Plaintiffs did not attend two IEP team meetings scheduled to review a draft IEP for the 2005-2006 school year.  At a meeting that the Plaintiffs failed to attend, held on June 30, 2005, Timberlane determined that the school district was no longer an appropriate placement for EG.  Timberlane then proposed placing

EG at LSA for the 2005-2006 school year, a placement which Ms. K. had previously requested.  When Plaintiffs refused to consent to Timberlane's proposals for the 2005-2006 school year, Timberlane requested that the New Hampshire Department of Education ("DOE") hold a due process hearing.  See In re: Elenora G./Timberlane Regional Sch. Dist., Matter No. IDPH-FY-06-10-021, (N.H. DOE, Dec. 14, 2005) (Ex. 1 to Defendant's Objection).

During its preparation for the due process hearing, Timberlane subpoenaed hospital records that showed that Plaintiffs had hospitalized EG between August 24 and September 14, 2005 for psychiatric reasons.  Id. at 3.  Plaintiffs had not previously disclosed that information to Timberlane.

On November 29, 2005, a due process hearing was held.  Id. at 1.  Ms. K appeared briefly, but then left without participating.  Id.  Plaintiffs did not submit any evidence in opposition to Timberlane's proposed IEP and placement. Timberlane noted during the hearing that it had obtained new medical information about EG that might necessitate changes in EG's IEP and placement.  The Hearing Officer directed that the new medical information be considered by the special education team during EG's upcoming tri-annual evaluation.  Id. at 3.

3

The Hearing Officer issued a decision dated December 14, 2005 finding that LSA was an appropriate placement for EG, and that the IEP that Timberlane proposed for EG in June 2005 was appropriate.  Id. at 5.  The last paragraph of the decision states:

> Unless [EG] is determined to be unable to attend school by a treating physician or psychiatrist, she shall attend the Learning Skills Academy under the IEP offered by the School District for the 2005–2006 school year until such time as the school district special education team, in a timely manner reviews the new medical information now available, completes its tri-annual evaluation and offers a new IEP.

Id. at 5.

II.   EG's Diagnostic Placement at LSA

LSA accepted EG on a diagnostic placement in the fall of 2005.  In a letter dated November 30, 2005, Mr. Mann informed Ms. K. that LSA would initially use EG's existing IEP, but he noted that the IEP team would meet 30 to 45 days after EG began at LSA to review her IEP goals, services, and the appropriateness of her placement.  Pls.'s Ex. 9.  LSA decided to accept EG as a student based upon the evaluative information that Plaintiffs provided. McManus Aff., ¶ 3.[1]

_____

[1]The Court granted Timberlane's request to introduce in evidence Ms. McManus' affidavit, dated March 27, 2006, since Ms. K. called her as a witness at the hearing and questioned her

EG did not begin attending LSA immediately.  In a letter
dated December 14, 2005, Mr. Mann informed Ms. K. that:

> Before [EG] can begin school, we will need her
> psychiatrist to verify that any psychological issues
> which could interfere with the education at our school
> are under control . . . .  We can begin [EG]'s
> programming at LSA as soon as we receive that
> verification, so please arrange contract [sic] with her
> doctor as soon as her condition is under control.

Pls.' Ex. 10.  LSA does not serve students diagnosed with active
psychiatric conditions, as it is not approved to do so by the
DOE, and does not have qualified staff, the appropriate program,
or facilities to address the needs of such students.  McManus
Aff., ¶¶ 8, 9.  Plaintiffs provided LSA a note dated December 16,
2005 from Dr. Marc Sadowsky, a psychiatrist, which states: "I am
treating [EG].  She will be able to attend school starting on
12/22/05.  I last saw her on 12/6/05 and will continue to treat
her."  Pls.' Ex. 15.

EG began attending LSA on January 9, 2006.  LSA staff knew
that EG had been diagnosed with juvenile diabetes and attention
deficit hyperactivity disorder, but Plaintiffs did not inform LSA
that EG had an active psychiatric disorder.  McManus Aff., ¶ 10.
When an LSA staff member found a bottle of pills in EG's

---

extensively on the topics covered therein.

backpack, he called Plaintiffs for an explanation and was allegedly told to: "[p]ut them back in [EG's] backpack to bring home." Id., ¶ 11.  LSA staff members did not administer the medications to EG since they did not have doctor's orders or the Plaintiffs' permission to do so.

Ms. McManus alleges that it became apparent within days of EG's enrollment at LSA that her needs could not be met by LSA's personnel. McManus Aff., ¶ 21.  On January 24, 2006, EG reported seeing "spizzles." Id.  LSA staff members reported that EG had long processing delays, failed to respond to direct questions, and exhibited apparent manic behaviors.  Id.

EG attended LSA from January 9, 2006 until February 21, 2006.  She was absent seven days and tardy one day during that period.  Id., ¶ 20.  When EG was in attendance at LSA managing her diabetes was problematic.  Marla Podszus, a nurse who was privately assigned to EG under a contract with Timberlane, reported to Ms. McManus that she had repeatedly advised the Plaintiffs that they were sending inappropriate foods to school for EG for her lunches and snacks.  Id., ¶ 5.  The nurse also reported that the Plaintiffs never properly measured out the proper carbohydrates that should be provided to EG even though

they were repeatedly advised to do so.  <u>Id.</u>  LSA's staff is not qualified to measure carbohydrates for diabetics.  <u>Id.</u>

On February 21, 2006, Holly Lemerise, an LSA staff member, reported that EG tried to choke herself by attempting to swallow a charm on a bracelet.  <u>Id.</u>, ¶ 24; Pls.' Ex. 7.  Nurse Podszus allegedly witnessed this incident.  Ms. Lemerise reported that EG stated simultaneously that she needed to die.  The charm was removed from EG's mouth, and the bracelet was taken from her. Ms. McManus reported this incident to the New Hampshire Division of Children, Youth & Families, and informed Plaintiffs that EG could not return to LSA unless she was cleared by a psychiatrist and a safety plan was provided to LSA.  <u>Id.</u>, ¶ 25.

Shortly thereafter, Ms. K. informed Mr. Mann that she believed that EG was discussing dying at school because of a change in her insulin regime at home during which the parents had told EG that they needed to wake her in the middle of the night or she could die.  McManus Aff., ¶ 25.  Ms. K. authorized Mr. Mann to speak with Dr. Sadowsky about EG's treatment and diagnosis.  Pls.' Ex. 18.  Mr. Mann testified that when he contacted Dr. Sadowsky, however, he had not yet seen EG to evaluate her condition.  Mr. Mann informed the Plaintiffs in a

telephone message on February 24, 2006 that EG would not be permitted to return to LSA until she had been evaluated by her psychiatrist and cleared to return to school.

As part of their evidence, Plaintiffs submitted a tape recording of Ms. K.'s telephone messages to and from Timberlane and LSA staff members before and after the February 21, 2006 incident.  See Pls.' Ex. 27.  Included on that tape is a message that Ms. K. recorded on February 24, 2006 for Edwina Lovett, Assistant Director of Pupil Personnel Services at Timberlane. Ms. K. may be heard requesting an emergency meeting to discuss LSA's "suspension" of EG.  Id.  Ms. K. alleges that LSA had not been meeting EG's behavioral and functional needs, and suggests that a change in EG's placement was necessary.  Ms. K. also states during the recording that the Plaintiffs were requesting an emergency due process hearing with the DOE.  Id.

Mr. Mann sent Plaintiffs a letter dated February 24, 2006 stating that LSA was working with Timberlane to schedule a manifestation meeting.  Pl.'s Ex. 5.  He further stated that EG's diagnostic period would be over on March 10, 2006, and that LSA would be prepared to discuss EG's academic performance at LSA, recommendations for her IEP and recommendations for her placement

after March 15, 2006.  Id.  Timberlane scheduled an IEP team
meeting with Plaintiffs for March 6, 2006 at 10:00 a.m.

   After the February 21, 2006 incident, Ms. McManus asked LSA
staff members to provide her with their observations of EG's
response to LSA's programming.  Staff members reported to Ms.
McManus that EG was often very withdrawn and was not mentally
present most of the time she was at school.  Id., ¶ 14.  EG also
experienced significant mood swings.  Id., ¶ 16.  Other staff
members reported that EG randomly blurted out comments critical
of her appearance and popularity, demonstrated a profound
difficulty in answering questions, following directions, and
processing information, and performed very little academic work.
Id., ¶ 17–18.  Based on her observations, and the observations of
other staff members, Ms. McManus concluded that EG did not have
the capacity for learning at that time.  Id., ¶ 19.[2]

_____

   [2]Ms. K. challenged Ms. McManus' conclusion that EG did not
have the present capacity to learn with comments from Susanne
Renselaer, EG's science teacher.  In notes dated February 24,
2006, Ms. Renselaer wrote, in pertinent part, that:

   In the last few weeks, [EG] has had a calmer demeanor,
   and has been better able to attend to what is happening
   in class.  She has been able to read aloud in class;
   she was able to decode well, but struggled with
   comprehension.  She began taking direction regarding
   highlighting, and her writing became clearer.  She was
   also more likely to think before answering a question.

On March 6, 2006, Timberlane began an IEP meeting at 10:10 a.m. in the parent's absence.  Plaintiffs arrived at the meeting at about 10:40 a.m.  Ms. K. provided a note from Dr. Sadowsky dated February 24, 2006, which stated: "[EG] may return to school on 3/6/06.  Ativan may be given 0.5 mg every four hours for anxiety or agitation, up to four times in 24 hours."  Pls.' Ex. 13.  At about 11:15 a.m., Plaintiffs were asked to leave because they were yelling and being confrontational.  Id., ¶ 28.  Before the meeting concluded, the IEP team determined that LSA was no longer an appropriate placement for EG.

After the IEP meeting ended, LSA staff decided to prevent Mr. G., Ms. K. and EG from entering LSA due to concerns about Ms. K.'s behavior.  An LSA staff member, Ms. Pugliese, wrote in an incident report that the staff was concerned that Ms. K. would become disruptive, loud and demanding, possibly even violent, which could frighten and upset LSA's other students.  Def.'s Ex. B.  Ms. Pugliese locked the front door and would not let the Plaintiffs and EG enter the building despite their demands.

On that same day, Timberlane filed a request for an expedited due process hearing with the DOE.  Timberlane sought

Pls.' Ex. 6.  This appears to be the only evidence in the record that supports the Plaintiffs' position.

authorization to conduct a comprehensive assessment of EG, and to change EG's placement from LSA to an interim alternative educational setting.  Timberlane alleged that placing EG at a residential program was necessary because continued placement at LSA was substantially likely to result in injury to EG.

III. <u>March 2006 Due Process Hearing Decision</u>

On March 7, 2006, the DOE issued a scheduling notice to the Plaintiffs setting a pre-hearing conference for March 13, 2006, and setting hearing dates of March 20 and 21, 2006.  <u>See</u> <u>In re:</u> <u>Elenora G./Timberlane Regional Sch. Dist.</u>, Matter No. IDPH-FY-06-03-052, (N.H. DOE, Mar. 24, 2006) (Ex. 4 to Defendant's Objection).  Plaintiffs did not attend the pre-hearing conference.  <u>Id.</u> at 1.

On March 17, 2006, Plaintiffs filed the instant motion for injunctive relief.  They did not file a complaint with the DOE requesting an administrative hearing, or a request to have their claims heard during the due process hearing requested by Timberlane, before seeking relief in this court.

On March 20, 2006, at approximately 8:15 a.m., Ms. K. telephoned the Hearing Officer to inform him that Plaintiffs would not be attending the due process hearing.  Ex. 4 to Def.'s

11

Objection at 2.  The Hearing Officer went forward with the
hearing taking some live testimony and accepting the affidavits
of other witnesses.  Id. at 3.  Plaintiffs did not submit any
evidence.  Id.  The Hearing Officer found that the issues to be
determined were: "(1) whether it is necessary to conduct a
comprehensive reevaluation of [EG]; (2) whether the current
placement at [LSA] is substantially likely to result in injury to
[EG]; and (3) whether, LSA, irrespective of the threat of harm,
is an appropriate placement for [EG]."  Id. at 4.

    After considering Timberlane's evidence, the Hearing Officer
found that EG's deteriorating physical and mental health needs
strongly suggested that she would pose a threat of injury to
herself if her placement at LSA were maintained.  Id. at 10.  "As
such, school officials from LSA and the School District, along
with Nurse Podszus, uniformly and correctly agreed that
maintaining Eleonora's placement at LSA was not only
inappropriate but was substantially likely to result in injury to
Eleonora."  Id.  The Hearing Officer also made the following
findings of fact: (1) LSA is not certified to serve children
coded as emotionally handicapped; (2) LSA's staff was not
qualified to address EG's needs; (3) EG's performance at LSA

demonstrated "a continual decline from an emotional, physical
health and educational performance standpoint"; and (4) EG has
not benefitted from her education at LSA.  Id. at 11.

The Hearing Officer agreed with Timberlane that EG's social,
emotional, physical and educational needs required "placement in
a residential facility equipped to conduct a complete and
comprehensive assessment and, after these conditions are
stabilized to a point where she is available to learn, to develop
an interim IEP."  Id. at 12.  He recognized Brattleboro Retreat,
a residential care facility, as a facility equipped to address
EG's needs.  Id. at 12–13.

The Hearing Officer ordered Timberlane "to place EG in an
appropriate interim alternative educational setting for a period
of 45 school days or less, if school officials determine that a
change in placement is appropriate."  Id. at 16.  The Hearing
Officer also stated that the interim alternative educational
setting shall be deemed EG's stay put placement under 20 U.S.C. §
1415(k)(4)(A).  Id.

Plaintiffs were ordered "to fully and completely cooperate
in this critical process by releasing all requested records,
including psychiatric records, to the diagnostic placement,

granting the placement the right to consult with all of Eleonora's treating health care providers and participating in Eleonora's screening and intake procedures in a cooperative and expeditious manner." Id. at 17.  Plaintiffs were directed to apply for EG's admission to the Brattleboro Retreat within five business days of the issuance of the Hearing Officer's order. Id.  As of the date of the evidentiary hearing, Plaintiffs had made no inquiry or application to the Bratteboro Retreat about the services available to address EG's needs.

IV.  End of Diagnostic Period

Mr. Mann testified that LSA is no longer under contract with Timberlane to provide educational services for EG.  He testified that while he knew that EG had been treated by a psychiatrist before she began attending LSA, he was not sure whether LSA would be an appropriate placement for her.  He reiterated that EG was accepted by LSA provisionally, on a diagnostic placement.

Mr. Mann testified that after EG's IEP team determined on March 6, 2006 that LSA was not appropriate to meet EG's needs he saw no reason for LSA to contact Dr. Sadowsky for additional information regarding EG's psychiatric condition.  Mr. Mann further testified that LSA would not re-enroll EG in light of the

14

Hearing Officer's March 24, 2006 order finding that LSA is not an

appropriate placement for EG.

V.   <u>Appeal of December 2005 and March 2006 Hearing Decisions</u>

        Ms. K. alleged during the evidentiary hearing that she has

appealed the December 14, 2005 and March 24, 2006 due process

hearing decisions.  The Court is aware that Ms. K. has filed a

new complaint against Timberlane that has been entered on the

court's docket.  <u>See</u> <u>K. v. Timberlane Regional Sch. Dist.</u>, No.

06-cv-149-PB (D.N.H. filed Apr. 18, 2006).  That complaint was

filed on the day before the April 19th hearing <u>pro se</u> and <u>informa</u>

<u>pauperis</u>.  Pursuant to this court's local rules, Ms. K's

complaint will be subjected to an initial review to determine,

among other things, whether it establishes subject matter

jurisdiction, or states a claim upon which relief may be granted.

That review had not been undertaken as of the date of this Report

and Recommendation.

VI.  <u>April 2006 Notes from EG's Treating Psychiatrist</u>

        To support their contention that EG was wrongfully suspended

from LSA, Plaintiffs introduced into evidence a note from Dr.

Sadowsky dated April 17, 2006.  Pls.' Ex. 16.  That note states:

        [EG] is in treatment with me.  I do not believe she is
        a danger to herself or others.  She may return to

15

> school, ideally in a therapeutic setting.  I do not
> believe she needs hospital level of care at this time.

Id.  Mr. Mann testified that LSA had not received that note prior

to the evidentiary hearing, but in any event he denied that it

would be sufficient to allow LSA to re-enroll EG because LSA is

not "a therapeutic setting."  After the April 19th hearing

concluded, Ms. K. submitted an additional note from Dr. Sadowsky,

dated April 20, 2006, for the court's consideration.  See

Document No. 160.  In that note, Dr. Sadowsky writes:

> To clarify my previous note, [EG] does not require
> hospital level of care.  She should be in a school that
> can address her psychiatric needs.

Id.  As indicated above, however, Mr. Mann and Ms. McManus deny

that LSA is a school that is either approved for or appropriate

to educate any student with "active" psychiatric needs, and

specifically that LSA is an appropriate placement for EG.

## Discussion

### I.   IDEA Exhaustion Requirement

The "IDEA is a comprehensive education statute which seeks

to ensure that children with disabilities receive 'a free

appropriate public education . . . designed to meet their unique

needs.'"  Rose v. Yeaw, 214 F.3d 206, 209 (1st Cir. 2000)

(quoting 20 U.S.C. § 1400(d)(1)(A)).  IDEA requires state and

local agencies receiving federal funds to "establish and maintain
procedures . . . to ensure that children with disabilities and
their parents are guaranteed procedural safeguards with respect
to the provision of free appropriate public education by such
agencies."  20 U.S.C. § 1415(a); see also Honig v. Doe, 484 U.S.
305, 310–12 (1988).  Parents who believe that their disabled
children are not being properly served by these agencies as
required by the IDEA may present a complaint to the state or
local educational agency who will grant them an impartial due
process hearing.  20 U.S.C. §§ 1415(b)(6) & 1415(f)(1).  The
scope of such a hearing is broad, encompassing "complaints with
respect to any matter relating to the identification, evaluation,
or educational placement of the child, or the provision of a free
appropriate public education to such child."  20 U.S.C. §
1415(b)(6).  If, after a due process hearing, a parent is
dissatisfied with the result, he or she may file a civil action
in either state or federal court.  20 U.S.C. § 1415(i)(2)(A).

    "Before filing suit, however, the IDEA mandates that
plaintiffs exhaust administrative remedies through the due
process hearing."  Rose, 214 F.3d at 210; see also Rafferty v.
Cranston Pub. Sch. Comm., 315 F.3d 21, 25 (1st Cir. 2002);

17

<u>Frazier v. Fairhaven Sch. Comm.</u>, 276 F.3d 52, 59 (1st Cir. 2002).

Section 1415(l) provides that:

> Nothing in this chapter shall be construed to restrict
> or limit the rights, procedures, and remedies available
> under the Constitution, the Americans with Disabilities
> Act of 1990, title V of the Rehabilitation Act of 1973,
> or other Federal laws protecting the rights of children
> with disabilities, except that before the filing of a
> civil action under such laws seeking relief that is
> also available under this subchapter, the procedures
> under subsections (f) and (g) of this section shall be
> exhausted to the same extent as would be required had
> the action been brought under this subchapter.

20 U.S.C. § 1415(l).  The exhaustion requirement "enables the
agency to develop a factual record, to apply its expertise to the
problem, to exercise its discretion, and to correct its own
mistakes, and is credited with promoting accuracy, efficiency,
agency autonomy, and judicial economy."  <u>Christopher W. v.
Portsmouth Sch. Comm.</u>, 877 F.2d 1089, 1094 (1st Cir. 1989).
Therefore, in order to demonstrate that the court has
jurisdiction to hear their claims, Plaintiffs must demonstrate
that they have exhausted their administrative remedies for the
federal statutory claims asserted in their motion.

II. <u>Jurisdiction</u>

The instant lawsuit pertains to appeals of due process
hearing decisions issued during the 2003-2004 school year while

EG was a student at the Timberlane Middle School.  The matters about which the Plaintiffs complain in the instant motion are not part of the administrative record before the court.  The Plaintiffs neither filed a complaint with the DOE seeking an administrative hearing, nor requested to have their claims heard during the due process hearings that were requested by Timberlane, before seeking relief in this court.[3]  Therefore, I find that this court does not have subject matter jurisdiction over the claims presented in the Plaintiffs' motion.

Ms. K. argued at the April 19th hearing that the Plaintiffs were not required to participate in administrative proceedings because it would have been futile.  She asserts that Timberlane refused to comply with document subpoenas issued in other administrative proceedings, which made Plaintiffs believe that it was futile to further participate in those proceedings.

A plaintiff may be excused from the exhaustion requirement if she "can show that the agency's adoption of an unlawful general policy or practice would make resort to the agency

---

[3]The evidence in the record shows that the Plaintiffs were the first to raise the issue of the need for an emergency due process hearing with the DOE.  See Pls.' Ex. 28.  Nevertheless, Plaintiffs did not attend the expedited due process hearing that was requested by the Timberlane.

19

futile, or that the administrative remedies afforded by . . .
IDEA are inadequate given the relief sought." <u>Rafferty</u>, 315 F.3d
at 25 (citing <u>Weber v. Cranston Sch. Comm.</u>, 212 F.3d 41, 49 (1st
Cir. 2000)).  The plaintiff has the burden to demonstrate that an
exception to the exhaustion requirement applies.  <u>Rose</u>, 214 F.3d
at 211; <u>see</u> <u>also</u> <u>Honig</u>, 484 U.S. at 327.

In <u>Rafferty</u>, the First Circuit rejected the plaintiff's
argument that she should have been excepted from the exhaustion
requirement because the school district had delayed turning over
records because that assertion did not demonstrate an unlawful
general policy or practice by the agency.  <u>Rafferty</u>, 315 F.3d at
25.  Similarly here, Plaintiffs did not produce any evidence that
shows that Timberlane adopted an unlawful general policy or
practice of refusing to produce records.  Indeed, Plaintiffs did
not even introduce the specific subpoenas that they claim
Timberlane refused to honor.  There is no evidence before the
Court that shows that exhausting Plaintiffs' administrative
remedies for the claims they assert in their motion would be
futile.

Furthermore, Plaintiffs have not shown that the Hearing
Officer could not have awarded the relief that they seek.  The

issues of the appropriateness of EG's 2005–2006 IEP, and of her placement were directly before the Hearing Officer in the most recent due process hearings.  The Plaintiffs simply chose not to participate in them.  The Hearing Officer could have ordered Timberlane to implement the January 14, 2003 IEP, and to leave EG's placement at LSA unchanged if he found that the evidence so warranted.

Since the Plaintiffs have shown neither that Timberlane adopted an unlawful general policy or practice that would make resort to the administrative process futile, nor that the Hearing Officer could not have awarded them the relief they sought, Plaintiffs were required to assert the claims in their motion in administrative proceedings before seeking relief in this court.

III. <u>Redressability</u>

Even if this court has jurisdiction over Plaintiffs' claims, Plaintiffs have not shown that the issuance of an injunction would redress the harm that they have alleged.  LSA asserted at the evidentiary hearing that it is no longer under contract with Timberlane to provide educational services for EG.  Mr. Mann testified that LSA would not re-enroll EG in contravention of the Hearing Officer's March 24, 2006 order finding that LSA was not

21

an appropriate placement for EG.  Since LSA is a private school,

and is not a party in this case, the court has no authority to

order LSA to enter into a new contract with Timberlane to provide

educational services to EG.  The Court further notes that 20

U.S.C. § 1415(j), the IDEA "stay put" provision, does not

authorize this court to order Timberlane to attempt to place EG

in a school comparable to LSA.  <u>See</u> 20 U.S.C. § 1415(j); <u>see also</u>

<u>Wagner v. Bd. of Educ. of Montgomery County</u>, 335 F.3d 297, 301

(4th Cir. 2003) (holding that a district court erred in ordering

a school board to search for a comparable alternative placement

under the "stay put" provision of the IDEA in a case where the

student's then current educational placement became unavailable).

Thus, the harm that Plaintiffs allege would not be redressed by

an injunction issued by this court ordering Timberlane to end

EG's "suspension" from LSA and to implement her last agreed-upon

IEP.

IV.  <u>Plaintiffs' Evidence on the Merits</u>

        For the sake of completeness, the Court addresses the

evidence that the Plaintiffs presented on the merits of their

claims.  A court may grant a plaintiff's request for a

preliminary injunction if the plaintiff satisfies a four-part

test: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff will suffer irreparable harm if the injunction is not granted; (3) the injury to the plaintiff outweighs any harm that granting the injunction would inflict on the defendant; and (4) the public interest will not be adversely affected by the granting of the injunction.  See Langlois v. Abington Hous. Auth., 207 F.3d 43, 47 (1st Cir. 2000).  A party seeking injunctive relief must independently satisfy each of the four factors.  See Auburn News Co. v. Providence Journal Co., 659 F.2d 273, 277 (1st Cir. 1981).

A.   Evidence Outside of the Administrative Record

The claims that Plaintiffs present in their motion for injunctive relief raise issues that have already been considered and decided by a DOE Hearing Officer in decisions issued on December 14, 2005 and March 24, 2006.  Even if the court were to find that Plaintiffs properly appealed those decisions to this court, Plaintiffs face a high hurdle in overturning those hearing decisions because Plaintiffs admit that they chose not to participate in the administrative proceedings, and did not submit any evidence during those proceedings.  Although Ms. K. sought to re-litigate the issues that were decided by the Hearing Officer

at the April 19th evidentiary hearing, the evidence that she presented is not part of the record of the administrative proceedings.  Plaintiffs in IDEA cases do not have a license to ignore the administrative process and present their best evidence directly in a subsequent civil action.  <u>Roland M. v. Concord School Comm.</u>, 910 F.2d 983, 996 (1st Cir. 1990).  Rather, plaintiffs must provide some solid justification to persuade the court to allow the introduction of additional evidence outside of the administrative record.  <u>Id.</u>  The Plaintiffs' unsupported assertion that Timberlane failed to produce records in other due process hearings falls well short of a solid justification.

      B.   <u>EG's IEP and Placement</u>

The apparent bar to the presentation of Plaintiffs' evidence on the merits notwithstanding, I next consider Plaintiff's support for their claims regarding the implementation of EG's IEP and placement.

      1.   <u>IEP</u>

The Hearing Officer found in his December 14, 2005 hearing decision that Timberlane's proposed IEP for the 2005–2006 school year was appropriate, and that the Plaintiffs had not presented any substantive objection to Timberlane's proposal.  That

24

decision clearly displaced the last agreed-upon IEP, dated
January 14, 2003.  Moreover, the Hearing Officer noted that
Timberlane should offer a new IEP after EG was re-evaluated.
Plaintiffs offer no persuasive reason why the Hearing Officer's
IEP decision should be reversed in favor of the implementation of
an IEP agreed-upon by the parties more than three years ago.

        2.   Placement

        Plaintiffs argue that Timberlane is in violation of the IDEA
because LSA responded to EG's alleged behavior with an illegal
suspension.  Plaintiffs argue that Timberlane and LSA are
exaggerating the severity of EG's condition in order to support
their unilateral decision to remove her from LSA.[4]

        Ms. K. testified that on the day of the incident, she
received a telephone call from Mark Walsh informing the
Plaintiffs only that EG appeared to be sad at school that day and
inquiring whether anything unusual had happened at home.  The
evidence showed, however, that Mr. Walsh called the Plaintiffs on
February 21st both before and after the incident.  See Pls.' Ex.

---

[4]Ms. K. stated during the evidentiary hearing that she
believed that the February 21, 2006 attempted choking incident
may have been fabricated, but she did not call as witnesses
either Holly Lemerise or Nurse Podszus to testify about their
observations of EG's self-injurious conduct and EG's allegedly
suicidal statements to test that theory.

4.  The message that Ms. K. testified to was before Mr. Walsh was informed about the incident with the charm.

Plaintiffs argue that the failure of LSA staff to take any further preventative action after the incident showed that there was no serious risk of harm to EG.  But the evidence showed that Ms. Lemerise was able to remove the charm from EG's mouth before she choked.  Therefore, no additional immediate medical intervention was necessary.

Plaintiffs note that while Mr. Mann stated in his February 24, 2006 letter to Plaintiffs that LSA was working with Timberlane to arrange a manifestation meeting, <u>see</u> Pls.' Ex. 5, no manifestation meeting was held before EG was prevented from returning to LSA on March 6, 2006.  Plaintiff's argue that Timberlane's unilateral decision to not hold a manifestation meeting violates the IDEA.  Timberlane responds that EG has very serious medical and psychiatric needs that cannot be met at LSA.  Timberlane argues that Congress could not have intended a school district to hold a manifestation hearing under these circumstances because the determination of whether EG's behavior is a manifestation of her disability is irrelevant.

Section 1415(k), the statute under which the Hearing Officer

issued his change of placement order, has a presumption that the child's IEP team will make a manifestation determination when a child with a disability violates a code of student conduct.  20 U.S.C. § 1415(k)(1)(C)-(F).  If it is determined that the child's conduct was a manifestation of her disability, the child may be returned to her current placement under a behavioral intervention plan.  20 U.S.C. § 1415(k)(1)(F).  But § 1415(k)(3)(A) also provides that "a local educational agency that believes that maintaining the current placement of a child is substantially likely to result in injury to the child or others, may request a hearing."  20 U.S.C. § 1415(k)(3)(A).  Here, Timberlane immediately sought an expedited hearing after determining that maintaining EG's placement at LSA was substantially likely to result in injury to her.  The statute authorizes a hearing officer appointed to determine an appeal under § 1415(k)(3) to "order a change in placement of a child with a disability to an appropriate interim alternative setting for not more than 45 school days if the hearing officer determines that maintaining the current placement of such child is substantially likely to result in injury to the child or others."  20 U.S.C. § 1415(k)(3)(B)(ii)(II).

27

In this case, after considering Timberlane's evidence at an expedited due process hearing, a Hearing Officer found that EG's placement at LSA was inappropriate, and that placement in an interim alternative educational setting was warranted.  Since EG's placement was not formally changed until after a due process hearing was held, it does not appear that a manifestation determination was necessary.  To the extent that a manifestation meeting should have been held, however, Plaintiffs waived their right to raise that issue at the due process hearing.  Thus, I do not find that Plaintiffs are likely to obtain relief merely because Timberlane chose not to hold a manifestation meeting.

It must be further noted that Plaintiffs' most significant evidence on the issue of EG's placement, produced after the Hearing Officer's March 24, 2006 decision, does not a support a finding that the Hearing Officer's March 24, 2006 decision was erroneous.  In a note dated April 17, 2006, Dr. Sadowsky wrote that EG may return to school "ideally in a therapeutic setting." Pls.' Ex. 16.  And in a note dated April 20, 2006, Dr. Sadowsky clarified that EG needs to attend a school that can address her psychiatric needs.  But Mr. Mann and Ms. McManus have stated that LSA is neither qualified, nor appropriately staffed to address

28

the needs of students with active psychiatric conditions. Therefore, Plaintiffs' evidence does not contradict the Hearing Officer's finding that EG's continued placement at LSA is inappropriate.

There is no dispute that EG has not received any educational services since February 21, 2006.  But it appears from the record that Plaintiffs bear the brunt of the responsibility for the deprivation.  Plaintiffs never provided LSA a safety plan after the February 21, 2006 incident, therefore EG could not return to LSA before the change of placement order issued.  And Plaintiffs have since refused to comply with the Hearing Officer's order regarding placement at Brattleboro Retreat, or a similar residential facility that can address EG's needs.

In sum, I find that, even taking into consideration all of Plaintiffs' evidence, Plaintiffs have not demonstrated that they are likely to succeed on the merits of their claims pertaining to EG's IEP and placement.  Therefore, I find that injunctive relief is not warranted without discussing the remaining preliminary injunction factors.  See New Comm Wireless Serv., Inc. v. Sprintcom, Inc., 287 F.3d 1, 9 (1st Cir. 2002) (finding that if the moving party cannot demonstrate a likelihood of success on

the merits, the remaining preliminary injunction factors become matters of idle curiosity).

<u>Conclusion</u>

For the reasons set forth above, I recommend that Plaintiffs' motion for injunctive relief (document no. 133) be denied.

Any objections to this Report and Recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See <u>Unauthorized Practice of Law Comm. v. Gordon</u>, 979 F.2d 11, 13-14 (1st Cir. 1992); <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986).

James R. Muirhead
United States Magistrate Judge

Date: May 3, 2006

cc:  Mr. G., <u>pro se</u>
     Ms. K., <u>pro se</u>
     Jeanne M. Kincaid, Esq.