**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>**Mr. G. and Ms. K.**</u>

  **v.**          Case No. 04-cv-188-PB
                **Opinion No. 2007 DNH 002**
<u>**Timberlane Regional School
District**</u>


<u>**MEMORANDUM AND ORDER**</u>


  Plaintiffs, Mr. G. and Ms. K., (the "Parents") are the parents of "EG," a 15-year-old student who qualifies for special education and related services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 <u>et seq</u>. They filed this action against Timberlane Regional School District (the "District") on May 18, 2004[1] appealing four due process hearing decisions pertaining to EG's Individualized Education Program ("IEP") and placement during the 2003-04 and 2004-05 school years.  EG's parents claim that the District failed to provide EG with a free appropriate public education

---

   [1]  Plaintiffs filed amended complaints on December 21, 2004 (Doc. No. 19) and January 13, 2005 (Doc. No. 21).

("FAPE") as required by the IDEA.  More specifically, they allege
that the District violated their procedural rights to participate
in EG's education and failed to properly implement EG's IEP.[2]
They seek an order reversing the hearing officers' decisions
regarding parental involvement and the District's implementation
of the IEP, awarding prospective payment for placement in a
private school, awarding compensatory education for a two-year
period, and awarding litigation costs and expenses.  Because I
determine that the District satisfied the IDEA's procedural
requirements and implemented the parent-approved IEP in a manner
reasonably calculated to allow EG to receive educational
benefits, I affirm the decisions below.

---

[2]  It is extremely difficult to discern the scope of
plaintiffs' complaint and supporting briefs.  According to Ms.
K.'s testimony at a preliminary injunction hearing on April 19,
2006, she has prepared her court submissions using dictation
software.  The software's output, to put it mildly, is far from
perfect.  After thoroughly reviewing plaintiffs' submissions and
the transcript of a November 18, 2004 scheduling conference
during which I endeavored to clarify with plaintiffs the scope
and contours of their arguments (Doc. No. 20), I have attempted,
to the best of my ability, to characterize and address each of
plaintiffs' arguments.  To the extent plaintiffs contend that I
have either neglected or misconstrued any of their arguments, I
deem such arguments to be waived because they are indecipherable.

## I.   BACKGROUND[3]

EG was born on June 1, 1991. (Vol. 1, p. 11000).  She has a nonverbal learning disability (NVLD), Attention Deficit Hyperactivity Disorder ("ADHD"), and diabetes. (SD Finding of Fact #1– Granted; Vol. 5, pp. 17007, 17060).  Between May 2000 and November 2002, the time period representing the end of the fourth grade, all of the fifth grade and part of the sixth grade, the Parents home-schooled EG. (Vol. 1, pp. 11021, 11022; Vol. 5, pp. 17007, 17056, 17059, 17060; Vol. 4, pg. 13856).  In November 2002, EG began attending Timberlane Regional Middle School on a diagnostic IEP that ran from November 6, 2002 until January 2003. (Vol. 1, pp. 15086–087).

### A.   The IEP

Plaintiffs approved and signed an IEP for EG that covered the period from January 14, 2003 to January 14, 2004.  (Vol. 1, pp. 15097–117).  Both of EG's parents, as well as the appropriate teachers and administrators, attended the January 9, 2003 IEP meeting at which the District drafted the plan.  The IEP

---

[3]  Much of the background is taken from the parties' joint statement of material facts (Doc. No. 127).

identifies EG as a student with disabilities that effect all
areas of academic performance and indicates that EG is easily
distracted.  Achievement test scores support these findings.
(Id. at 15095).  The IEP identifies specific goals, including
increasing functional math, reading, writing, and overall
everyday skills.  It states that EG needs either small group
instruction or mainstreaming with assistance from a
paraprofessional in classwork, social interactions, and
assimilation.  The IEP proposes numerous modifications to the
regular education curriculum including, but not limited to,
extended time to complete tasks, alternative assessments,
individualized grading based on quality rather than quantity of
homework, constant reinforcement and reassurance, preferential
seating, attendance allowances and waiver of the tardy policy due
to EG's diabetes, and use of modified or parallel curricula
materials as necessary for academic achievement. (Vol. 1, pg.
15102).  The IEP requires the District to provide EG's parents
with progress statements through regular report cards and half-
year objective reports.  The IEP provides for special education
in reading, math, and language arts in the Resource Room for 12
hours per week, modified mainstream education in other courses

-4-

for 16 hours per week, and special education therapy.

**B.    Hearing One**

On November 21, 2003, approximately one year after returning EG to the public school system, the Parents filed a request for a due process hearing ("Hearing One") with the New Hampshire Department of Education (the "Department").  The Department then assigned the case to Hearing Officer LeBrun. (Vol. 1, pp. 11000-02).  At the time of the hearing, EG was a seventh-grade student. (Id. at 11088).  On January 9, 2004, the Parents and District attended a pre-hearing conference. (Vol. 1, pp. 12001-16).  The Parents submitted a list of issues (Id. at 11016-17) which the hearing officer concluded were sufficient. (Id. at 11062).  These issues included challenges to the District's implementation of EG's IEP in both the sixth and seventh grades. (Id. at 11016-17).  On January 12, 2004, the hearing officer issued a pre-hearing conference order establishing, inter alia, hearing dates of January 22 and 27, 2004, dates agreed upon by the parties, and indicating that the Parents would present their evidence first. (Id. at 11062; 12011-14).  In response to a discovery order (Id. at 11062),

counsel for the District outlined for the hearing officer all of
the records that the District had provided to the Parents. (Id.
at 11067–68).

On January 13, 2004, the Parents filed another hearing
request ("Hearing Two") (Id. at 11096–102).  On January 20, 2004,
two days before testimony was to begin in Hearing One, the
Parents requested the hearing officer to consolidate Hearings One
and Two. (Id. at 11093).  The hearing officer denied the request.
(Id. at 11118).  On January 21, 2004, Ms. K. asked the hearing
officer to postpone the hearing scheduled for the following day.
The hearing officer refused to speak with Ms. K. without the
District present. (Id. at 11117).  After the hearing officer left
for the day, Ms. K. sent him a fax; the District received a 40–
page fax after 5:00 p.m. that same day. (Id.)

As the hearing officer had not granted a postponement of the
hearing, a request he found untimely, he allowed the hearing to
go forward on January 22, 2004 with Kathleen Cotts, a case
coordinator and special education teacher, testifying on behalf
of the District. (Id., pp. 12017–43).  Cotts testified that she
had experience with NVLD through students and workshops, that she
taught EG math, language and reading, and that EG performed

-6-

significantly below grade level.  Cotts said she met with EG's regular education teacher once per week, that EG did not often do homework, and that EG received easier homework assignments because she received little parental support.  Cotts testified that at times Ms. K. returned EG's student agenda book with a note indicating that EG would not be doing her assigned homework. Cotts said EG enjoyed her cooking group.

That same day, the hearing officer issued a supplemental order, notifying the Parents that their request for a postponement was denied, that day two of the hearing would occur on January 27, 2004, permitting the Parents to have an additional day for testimony, and prescribing details regarding further communications. (Id. at pp. 11117–19).  The hearing officer also concluded that the District had made all student records available to the Parents. (Id. at 11117).  On January 30, 2004, the hearing officer affirmed his order pertaining to records. (Vol. 5, p. 17000; Vol. 1, pp. 17012, 17060).[4]  The District made

---

[4]  The hearing officer's January 22 and 30, 2004 disposition of the allegations pertaining to the Parents' right to access records is consistent with a July 15, 2003 ruling issued by the Department pursuant to N.H. Code Admin. R. 1127.01 and 34 C.F.R. § 300.662 brought by the Parents alleging a similar denial of access which the Department also found to be unsubstantiated.

Crotts, who testified on January 22, 2004, available for cross examination. (Vol. 5, p. 17058).  On cross examination, Crotts indicated that the District modified EG's curriculum on an ongoing and as-needed basis with input from EG's teaching assistant and regular education teacher where appropriate.  She testified that the District taught EG a modified seventh-grade curriculum and that EG is capable of doing the work and being successful.

On January 27, 2004, School Psychologist John Secor testified for the District.  He indicated that the approved IEP addresses the needs of an NVLD student, that the modifications were appropriate, and that the IEP reflected the findings and recommendations of a neuropsychological evaluation of EG.  Beth Baddeley, a seventh-grade guidance counselor, testified that she provides EG with the counseling services called for in the IEP. She said EG is pleasant, quiet and cooperative, and shines with

---

(Vol. 5, pp. 15182-86).  On August 21, 2003, the Department reaffirmed its decision, finding no substantiation to the Parents' Complaint.  However, the Commissioner of Education emphasized that even if the District had failed to copy certain materials for the Parents, a "textbook" and "curriculum" are "not educational records as it do[es] not contain information directly related to a student." (Id. at 15215).

her peers.  She opined that, although progress was inconsistent, EG made overall improvements towards her goals and objectives. Christopher O'Callahan, the special education department head, also testified for the District.  He said he spent a lot of time with EG and that team members engaged in ongoing discussions over EG's IEP and progress.  He said the educators focus on EG's processing, writing and verbal language deficits, use untimed and repetitive practices, access the general curriculum with modifications, and employ a student-to-teacher ratio of approximately 3-to-1.  He said that the District issued progress reports and made numerous unsuccessful attempts to have progress meetings with EG's parents.  Suzanne Beaupre, EG's science and homeroom teacher, said that EG used a seventh-grade curriculum as modified by the IEP, that she felt EG was making progress, and that the District followed the IEP.  She said she attended a meeting on October 15, 2003, but that EG's parents terminated the meeting after five minutes declaring that they "will go straight to Due Process."

Plaintiffs then presented four witnesses: Lisa McManus, educational director of a private school called the Learning Skills Academy ("LSA"); District Superintendent Douglas McDonald;

-9-

Jackie Oros, sixth grade curriculum coordinator; and Ms. K.
McManus testified under subpoena about LSA's program and
generally about developing and implementing IEPs.  She did not
know EG.  McDonald testified under subpoena about matters
irrelevant to the implementation of EG's IEP.  Oros said she
works with teachers to align curriculum with New Hampshire
standards but that she was not involved in special education.

Ms. K. then testified that in her opinion EG performed well
during home-schooling with the exception of math.  The parents
believed EG needed special instruction in math and thus re-
enrolled her in public school.  Ms. K. indicated a willingness to
work with the IEP team, believed EG performed at grade level, and
said she received no progress reports except for regular report
cards.  She said she was appalled by the limited work sample the
District provided to her and that EG expressed despair and apathy
toward school.  She accused the District of having an aide answer
EG's standardized test questions and declared that EG only needs
a modified curriculum in math.

On March 25, 2004, the hearing officer issued a decision.
(Vol. 5, pp. 17054-60).  He concluded that the Parents had failed
to establish that the District had committed any procedural

violations that constituted a denial of FAPE. (Id. at 17060).
He concluded that the Parents had failed to establish that the
District had improperly or inappropriately implemented the IEP,
which the Parents had signed, or denied the child FAPE in any
way. (Id.)  He also concluded that the staff working with EG were
adequately trained and prepared and that the District had not
withheld documentation or information from the Parents. (Id.)

The hearing officer granted all of the District's requests
for Rulings of Law and all but four requests for Findings of
Fact. (Id. at 17060, 17003-06, 17007-13).  Among the District's
relevant Findings of Fact the hearing officer granted include the
following: (1) Ms. K. signed the IEP running from January 2003 to
January 2004 (Vol. 5, pp. 15097-117, 17008; Finding of Fact #13);
(2) EG receives a modified curriculum but one that follows the
general curriculum used with other students (Findings of Fact #s
18, 20, 21, 22, 25 and 27, Vol. 5, pp. 17008-10); (3) EG is
educated in a self-contained classroom for reading, math and
language arts for a total of 12 hours per week (Finding of Fact
#16, Vol. 5, pp. 17008, 15115); (4) EG takes part in modified
mainstream social studies and science courses and is fully
mainstreamed in unified arts classes (Finding of Fact #20, Vol.

-11-

5, pp. 17009, 15098); (5) EG's IEP contains measurable
percentages, portfolio review ,and regular testing as objective
means to measure her progress (Finding of Fact #15, Vol. 5. p.
17008); (6) Progress may be measured using observations, notes,
portfolios and tests (Finding of Fact #30; Vol. 5, p. 17010); (7)
On a trimester basis, the District notifies the Parents as to
EG's progress via progress reports, a regular report card, and an
IEP report card, which, along with team meeting notes, document
compliance with EG's IEP (Finding of Fact # 40, Vol. 5, p.
17011); (8)  Mid-trimester reports are generated from a review of
EG's work portfolio and consultations with teaching assistants
(Finding of Fact # 42, Vol. 5, p. 17011); and (9) The District
attempted to hold regular progress meetings with the Parents on
numerous occasions. (Finding of Fact #43, Vol. 5, p. 17011)

C.   **Hearing Two**

    As indicated above, on January 13, 2004, the Parents filed a
second hearing request while the first due process hearing was
pending. (Vol. 6, pp. 21005-15).  At that time, EG, age 12, was
attending Timberlane Regional Middle School as a seventh-grade
student. (Vol. 12, pp. M21152, M27022, M27094).  Because the

hearing officer in Hearing One declined to consolidate the two
hearings, on January 28, 2004, the Department appointed S. David
Siff to preside over the hearing. (Vol. 12, p. M21024).  At the
Parents' request, on January 30, 2004, Hearing Officer Siff
issued an order rescheduling the pre-hearing conference. (Vol. 6,
p. 21080, Vol. 12, p. M21079).

The District filed a Motion in Limine (Vol. 12, pp.
M21095-98) and a Motion for Summary Judgment. (Vol. 12, pp.
M21117-20).  In its Motion in Limine, the District sought to
ensure that the hearing officer did not entertain claims being
entertained in Hearing One. (Vol. 12, pp. M21095-98).  On
February 27, 2004, Ms. K. and the District attended a pre-hearing
conference. (Vol. 6, p. 22001-98; Vol. 12, p. M21150).  Ms. K.
represented that the three issues pending in Hearing One were:
(a) the student's involvement in the general curriculum; (b)
failure of the District to train the student's service providers;
and (c) failure to implement the student's IEP. (Vol. 12, p.
M21150).  Ms. K. agreed that she could not relitigate matters
pending before Hearing Officer LeBrun. (Id.).

On February 27, 2004, the hearing officer issued a pre-
hearing conference report in which he narrowed the focus of

-13-

Hearing Two to three issues: (a) whether EG's then-current placement was appropriate; (b) whether the District failed to implement EG's IEP between 11/03/03 and 1/13/04 (the time between the hearing requests in Hearing One and Hearing Two), and only to the extent the issue is not addressed in Hearing One; and (c) whether the District inappropriately marked EG as absent and reduced her grades between the time of the first and second hearing requests. (Vol. 12, p. M21151).

A hearing was held on March 16, 2004 (Vol. 6, pp. 22099-302) and March 22, 2004. (Vol. 6, pp. 22303-451).  On April 1, 2004, the hearing officer issued a decision. (Vol. 12, pp. M27086-95). The hearing officer placed the burden of persuasion on the Parents "as the party challenging the status quo in the middle of a school year covered by an agreed IEP." (Id. at M27092).  The hearing officer granted all but four of the District's Requests for Findings of Fact and all but three Rulings of Law. (Id. at M27094; M27022-30; M27036-42).  He noted that the Parents did not challenge the process for development and agreement on the January 2003 - January 2004 IEP. (Id. at M27092).  The Parents claimed one procedural violation: the District's decision to convene a meeting to develop an IEP on January 7, 2004 when the

-14-

Parents had requested a five-day extension to review records.
(Id. at M27087).  The hearing officer concluded that the District
had made reasonable attempts to secure the Parents' participation
but they had elected not to participate in the meeting. (Id.)  He
found that although the District had offered the Parents nine
dates to participate in an IEP meeting, the Parents never
responded to the District's offered dates. (SD Finding of Fact
#38 - Granted; Id. at M27027, M27094).  The Parents consistently
refused mailings and insisted upon preconditions for their
participation. (Id. at M27093).  He agreed that the Parents had
"failed to cooperate with the special education process." (SD
Ruling of Law #31 - Granted; Id. at M27041, M27094).

    The hearing officer concluded that the Parents did not
establish that the District denied them the opportunity to
inspect EG's records.  He found that on June 17, 2002, the
District produced a copy of the student's special education file
and further, that the Parents could inspect educational records
during normal business hours. (Id. at M27087).  He found that the
Parents had signed the student's IEP, which indicated that
academic testing would be done and thus no further consent was
required. (SD Rulings of Law #s 19, 20 - Granted: Id. at M27039,

-15-

M27094).  The hearing officer further found no reasonable basis
to conclude that the agreed-upon placement was inappropriate
between November 13, 2003 and January 13, 2004. (Id. at M27093).
The hearing officer also rejected the Parents' assertion that the
District had failed to implement the IEP during the two months in
question. (Id.)  He agreed that EG had made progress in
occupational and speech therapies (SD Finding of Fact #s 11, 17 –
Granted; Id. at M27023, M27024, M27094), and concluded that the
student was making reasonable progress despite the Parents'
refusal to encourage EG to do her homework.  He stated that the
"Parent is deliberately hindering Student's participation in the
educational program by refusing to permit Student to complete
homework." (SD Finding of Fact #s 25, 27 – Granted; Id. at
M27094, M27025).

     He agreed that standardized test results demonstrate that EG
had made progress in Broad Reading, Broad Math, Broad Written
Language and Written Expression and that she had not regressed in
any area. (SD Finding of Fact #s 28, 30 – Granted; Id. at M27025,
M27026, M27031, M27094; SD Ruling of Law #12 – Granted; Id. at
M27038, M27094).  The hearing officer found that the service
providers and special education teacher reported on EG's progress

-16-

on a trimester basis. (SD Finding of Fact #s 10, 14, 15, 16, 26 – Granted; Vol. 12, pp. M27023, M27024, M27025, M27094).  He agreed that the Parents produced no evidence that EG's grades were reduced or that she was penalized for lack of homework production when medical issues were present. (SD Finding of Fact #31, Ruling of Law #13 – Granted; Vol. 12, pp. M27026, M27038, M27094).  The hearing officer also found that there was no credible evidence that the student's absences, even if for medical reasons, rendered the District's placement inappropriate. (Vol. 12, p. M27094).

**D.    Hearing Three**

On March 15, 2004, one day before testimony was to begin in Hearing Two, the Parents filed another hearing request. (Vol. 9, pp. 31000–14).  On March 26, 2004, the Department appointed S. David Siff to preside over the hearing. (Vol. 9, p. 31015).  The District filed a Motion to Dismiss (Vol. 12, pp. M31019–32), an Addendum to its Motion to Dismiss (Vol. 12, pp. M31065–67) and a counterclaim seeking an order affirming the appropriateness of its proposed IEP running from January 2004 to January 2005 to which it had attempted to secure parental consent and its

placement. (Vol. 12, p M31035).  The Parents had repeatedly rejected the January 2004-05 proposed IEP and placement. (Vol. 9, pp. 31084-100).

On April 8, 2004, Hearing Officer Siff held a pre-hearing conference, seven days after rendering his decision in Hearing Two. (Vol. 9, p. 32000).  The Parents did not appear for the pre-hearing conference nor did they seek a continuance. (Id.; Vol. 12, p. M31070).  Mr. G. and Ms. K. were at Timberlane Middle School that morning, wherein Ms. K. was wearing a sign and picketing to protest EG's educational conditions. (Vol. 9, p. 32000; Plaintiffs' Amended Complaint ¶148).  The Parents sent their daughter to school with a note on her bag saying something to effect of "why are you stealing my child's education."  The Parents went into the principal's office and had a heated discussion.

The hearing officer noted that the Department's hearing technician had denoted the issues in Hearing Three to be IEP, placement, testing and compensatory education. (Id. at 31015, 32001).  The hearing officer opined that it appeared as if "most of these issues if not all of these issues are a rehash of the issues from 2002/2003 and into 2004." (Id. at 32001; Vol. 12, p.

M31070).  The hearing officer allowed the Parents 10 days to
submit an Objection to the District's Motion to Dismiss. (Id.)
Assuming that he did not dismiss the Parents' hearing request, he
ordered the Parents to present their case first on April 27,
2004. (Vol. 9, p. 32003; Vol. 12, p. M31070).  As there was some
concern about the ripeness of the proffered IEP and placement,
the District withdrew its counterclaim and decided to file its
own hearing request (Hearing Four). (Vol. 9, pp. 32001-04; Vol.
10, pp. 41000-02).

On April 12, 2004, the Parents filed an Objection to the
District's Motion to Dismiss along with an Affidavit. (Vol. 12,
pp. M31072-80).  On April 13, 2004, Hearing Officer Siff issued
an order dismissing the Parents' hearing request. (Vol. 9, pp.
37000-02).  The hearing officer pointed out that Ms. K. had
previously acknowledged to this same hearing officer that she was
barred from relitigating issues that had already been entertained
in a previous hearing. (Id. at 37000).  He found that except for
one claim — the assertion that on or about January 5, 2004 the
District had conducted testing of EG without parental consent —
all of the Parents' allegations had been addressed in Hearings
One and Two. (Id.)  He also concluded that the Parents were

-19-

seeking compensatory education in the form of an order placing EG
at Learning Skills Academy, the same placement the hearing
officer rejected in Hearing Two. (<u>Id.</u> at 37001).  The hearing
officer concluded that even if the District had not given the
Parents proper notice of testing, such a failure would not
justify an award of compensatory education in light of the
progress the student had been making. (<u>Id.</u>)  Under the doctrines
of res judicata and collateral estoppel, the hearing officer held
that the Parents were barred from bringing forth any claims that
either were raised or could have been raised in Hearings One and
Two. (<u>Id.</u> at 37002).

**E.    <u>Hearing Four</u>**

On April 15, 2004, the District filed a hearing request
seeking an order affirming its proposed IEP and placement. (Vol.
10, pp. 41000-02).  The District alleged that EG's IEP had
expired on January 13, 2004.  The District had made repeated
attempts to schedule meetings with the Parents to discuss IEP
and placement.  A meeting was scheduled for April 5, 2004, but
the Parents rejected the proposed IEP and placement prior to the
meeting and refused to discuss the IEP and placement at the

meeting. (Id. at 41001, 45089–192).

On April 19, 2004, the Department appointed S. David Siff to preside over the hearing. (Id. at 41003).  The scheduling notice set forth a pre-hearing conference for May 7, 2004 at 9:00 a.m. and hearing dates of May 20 and 21, 2004. (Id.)  On May 5, 2004, the Parents called the hearing officer demanding a continuance due to multiple medical appointments for the student scheduled on that day. (Id.)  The hearing officer advised the Parents that they must contact the District and ask for its view of a continuance, and if they agreed, the Parents needed to provide alternative agreed upon dates. (Id.)  The Parents advised the hearing officer that they do not talk with the District's attorney or staff. (Id.)  The hearing officer advised the Parents that he would not grant a continuance over the phone, without hearing from the District and without alternative agreed upon dates. (Vol. 10, p. 42001; Vol. 12, p. M41050).  The hearing officer noted for the record that the Parents have sought continuances in the past and that the hearing officer had given the same conditions to them at that time, consistent with the information provided in the Department's scheduling notice. (Vol. 10, pp. 42002, 41005; Vol. 12, p. M41050).  The Parents advised

-21-

that they would put their request in writing, which was received

on May 6, 2004.  However, the request did not indicate that the

Parents had consulted with the District, nor did it include

alternative pre-hearing and hearing dates.  The only dates

offered were "after June 5th." (Vol. 10, p. 42002; Vol. 12, pp.

M41041-43, M41050).

　　　The Parents did not appear for the pre-hearing conference.

(Vol. 10, p. 42000; Vol. 12, p. M41050).  At the pre-hearing

conference, the District advised the hearing officer that the

Parents had not discussed a continuance with the District and the

District objected to a continuance.  The District represented

that the student's IEP expired on January 13, 2004, and the

school year was rapidly coming to a close.  The District asserted

that the Parents had failed to cooperate in scheduling and

meeting to discuss the IEP. (Vol. 12, p. M41050).  The hearing

officer reviewed the Parents' request to dismiss the hearing

initiated by the District and substitute it with a parental

request for a hearing.  He advised that if the Parents intended

to assert any new claims, not already previously litigated in

Hearings One and Two, they would need to put their claim in

writing by May 11, 2004. (Id. at M41051).  In particular, the

hearing officer stated that if the Parents prefer some
alternative IEP, they must put their request in writing. (Vol.
10, p. 42005).

Based on the Parents' repeated assertions of harm to the
student, the District filed a Motion to Compel Production of
Information, in particular, the release of medical information to
substantiate their claims of harm. (Vol. 10, pp. 41007-09).  The
hearing officer granted the request and directed the Parents to
indicate in writing by May 11, 2004 the "medical or psychological
providers who have been consulted in connection with any harm
claimed caused by the District, and provide copies of the office
records and any written information provided by such provider
relative to the claim of harm."  If the Parents failed to produce
such information, the hearing officer ruled that they would be
barred from introducing such evidence during the hearing, either
in the form of direct or cross examination testimony. (Vol. 10,
pp. 42003-04; Vol. 12, p. M41051).

The hearing officer directed that the District present its
case first, on May 20, and the Parents on May 21, 2004. (Vol. 10,
p. 42006; Vol. 12, p. M41052).  The hearing officer ordered that
any changes to the hearing schedule must be made by May 11, 2004,

-23-

and directed the Parents to contact the District's counsel to make such arrangements. (Id.)  On May 20, 2004, the District came prepared to present its case in chief, but the Parents did not appear. (Vol. 10, pp. 42010-11; 47000).  The District filed a Motion for Summary Judgment. (Vol. 10, pp. 41059-65; Vol. 12, pp. 41066-108).  In accordance with the hearing officer's suggestion (Vol. 10, p. 42007), the District drafted Affidavits of its witnesses which it submitted in lieu of testimony, given the Parents' decision not to participate. (Vol. 12, pp. M41094-108).

On May 21, 2004, the hearing officer rendered a decision. (Vol. 10, pp. 47000-04).  He noted the many efforts that the District had made to secure parental participation in the development of the IEP, but that Ms. K. had returned the draft IEP prior to the meeting with the notation: "We reject your IEP and your placement." (Id. at 47002-03).  Although the Parents attended the meeting on April 5, 2004, they refused to discuss the IEP or anything but their desire to have EG attend an out-of-district placement. (Id.)  The Parents did not identify any changes to the IEP they wished to see. (Id.)  The hearing officer granted the District's request to amend the IEP to specify the dates in which it runs: April 5, 2004 to June 17,

-24-

2004 and August 31, 2004 to April 4, 2005. (Id. at 47002).  The

hearing officer upheld the proposed IEP and concluded that it

could continue to be appropriately implemented in the Timberlane

Middle School. (Id. at 47003-04; 45074-88; 45257).  The hearing

officer also affirmed the appropriateness of the Nursing Plan

and Health Plan (Vol. 10, p. 47001), and dismissed the Parents'

counterclaims as they chose not to attend the pre-hearing

conference or hearing and explain their positions. (Id. at 47000,

47003-04).

## II.  ANALYSIS

Plaintiffs have appealed all four hearing decisions,

asserting a broad and often difficult to decipher array of

procedural and substantive challenges.  In addressing their

appeal, I first discuss the IDEA and then consider their

challenge to each hearing decision in turn.

### A.  The IDEA

#### i.  Purpose

The purpose of the IDEA is to "ensure that all children with

disabilities have available to them a free appropriate public

education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living."  20 U.S.C. § 1400(d)(1)(A).[5] A disabled child's right to a free and appropriate public education is assured by the development and implementation of an IEP.  See Honig v. Doe, 484 U.S. 305, 311–12 (1988).

### ii.  Procedural Safeguards

The IDEA provides children with disabilities and their parents with a number of important procedural safeguards.  See 20 U.S.C. § 1415(a).  A disabled child's parents must be included as part of the team that develops and reviews a child's IEP.  See id. § 1414(d)(1)(B).  Parents are also entitled to: (1) examine all records relating to the child; (2) participate in meetings concerning the child's educational placement; (3) obtain an independent educational evaluation of the child; (4) receive written notice of any proposal to alter or to refuse to alter the child's educational placement; and (5) present complaints with

---

[5]  New Hampshire implements the IDEA through its special education law, N.H. Rev. Stat. Ann. § 186-C, and adopts by reference the federal regulations as to special education for disabled students in private schools.  N.H. Admin. Rules, Ed. 1117.03 (2003).

respect to any matter relating to the identification, evaluation
or educational placement of the child.  See id. § 1415(b).

I will set aside an IEP based on a procedural deficiency
only if I find "'some rational basis to believe that procedural
inadequacies compromised the pupil's right to an appropriate
education, seriously hampered the parents' opportunity to
participate in the formulation process, or caused a deprivation
of educational benefits.'"  Hampton Sch. Dist. v. Dobrowolski,
976 F.2d 48, 54 (1st Cir. 1992) quoting Roland M. v. Concord Sch.
Comm., 910 F.2d 983, 994 (1st Cir. 1990).  See also Lt. T.B. v.
Warwick Sch. Comm., 361 F.3d 80, 84-85 (1st Cir. 2004).

### iii. **Adequacy and Implementation of the IEP**

An IEP is considered appropriate if it "provides instruction
and support services which are reasonably calculated to confer
educational benefits to the student" in the least restrictive
environment.  Dobrowolski, 976 F.2d at 50.  An IEP must contain
both a statement of the child's "present levels of performance"
and "a statement of the special education and related services
and supplementary aids and services to be provided to the child."
20 U.S.C. § 1414(d)(1)(A).  IEPs must be revised not less than

-27-

annually.  See id. § 1414(d)(4)(A).

While parents are always free to seek optimal educational opportunities for their children, under federal law "the benefit conferred [by the IEP] need not reach the highest attainable level or even the level needed to maximize the child's potential." Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993).  An IEP can provide FAPE even though it "may not be the *only* appropriate choice, or the choice of certain selected experts, or the child's parents' *first* choice, or even the *best* choice," Amann v. Stow Sch. Sys., 982 F.2d 644, 651 (1st Cir. 1992) (emphasis in original) (internal quotations omitted).  The IDEA, however, does require FAPE, which courts have interpreted to mean that the school must provide "instruction and support services sufficient 'to permit the child to benefit educationally from that instruction.'" Roland M., 910 F.2d at 987 (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 203 (1982)).

Parents challenging the adequacy of an IEP must show that there was no reasonable probability that their child could benefit from it.  I review the record to see if a preponderance of the evidence supports the hearing officer's decision that the IEP was appropriate and that the District could implement it.

-28-

See <u>Roland M.</u>, 910 F.2d at 989.  Because educational policy is
the particular expertise of the local educational authority, I
will ordinarily find a school-proposed IEP acceptable if it is
based upon an "accepted, proven methodology."  <u>Id.</u> at 989-93
(recognizing that judges should give "due weight" to a state
agency's decision in order to "prevent judges from imposing their
view of preferable educational methods upon the States")
(internal quotations omitted).  <u>See also</u> <u>Lt. T.B.</u>, 361 F.3d at 83
("courts are ill-equipped to second-guess reasonable choices that
school districts have made among appropriate instructional
methods").  In assessing the adequacy of the IEP, I do not
consider whether another program would have been "better" but
only whether the District's IEP was reasonably calculated to
provide EG with some educational benefit, and whether Timberlane
Middle School could implement it.  <u>See</u> <u>id.</u>  Plaintiffs go one
step further and argue that — regardless of whether the District
could implement the IEP — it failed to do so.  Here my review is
one of "involved oversight."  <u>Roland M.</u>, 910 F.2d at 989.

    **iv.**  **<u>Private Placement</u>**

    The IDEA does not require school districts to pay for

tuition at private schools except under limited circumstances.
See Greenland Sch. Dist. v. Amy N., 358 F.3d 150, 157 (1st Cir.
2004).  A court or a hearing officer may, however, require a
school district to pay for private school tuition if it finds
that the school district is unable to provide FAPE or did not
make FAPE available in a timely manner prior to the private
school placement.  See 20 U.S.C. § 1412 (A)(10)(b), (c)(I)-(ii).
Parents who place their children in private school without the
prior consent of a School District do so at their own financial
risk.  See Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S.
359, 373-74 (1985).  I review the denial of private placement in
Hearing Two to see if the weight of evidence supports the hearing
officer's determination that the District provided FAPE at
Timberlane.

**B.    Hearing One**

Plaintiffs challenge the Hearing One decision on substantive
grounds.  Specifically, they argue that the hearing officer erred
in rejecting their claims that the School District failed to
implement the IEP, failed to teach EG the general curriculum, and
employed improperly or inadequately trained teachers.

In making these assertions, plaintiffs rely solely on their
own opinions and observations.  Aside from Ms. K.'s subjective
opinion that EG performed well during home-schooling, that her
work declined upon attending Timberlane, and that EG was unhappy
at school, plaintiffs offered no evidence to bolster their case.
Apart from commenting on her daughter's apparent unhappiness at
school, there is no evidence that Ms. K. possess the educational
qualifications or credentials to credibly assess EG's schoolwork
or progress.  Conversely, the District provided credible
testimony from numerous sources, all of which support the hearing
officer's ruling that the District properly implemented the IEP
and the modified curriculum plaintiffs agreed to in approving the
IEP.

The hearing officer found credible the testimony of Kathleen
Cotts, EG's case coordinator and special education teacher, Beth
Baddeley, EG's guidance counselor, Christopher O'Callahan, the
special education department head, and Suzanne Beaupre, EG's
science and homeroom teacher.  Each of these witnesses testified
that they taught EG using the special education and modified
regular education methods described in the IEP.  Like the hearing
officer, I find the testimony of those who taught EG valuable in

-31-

determining whether the District implemented the IEP and agree
with his decision.

Lastly, plaintiffs' doubts about the abilities and training
of District staff are not supportable given the evidence produced
at the hearing concerning their training and experience.

**C.**   **Hearing Two**

Plaintiffs challenge the Hearing Two decision on both
procedural and substantive grounds.

**I.**   **Procedural Violations**

In their procedural challenge, plaintiffs contend that the
District improperly held a team meeting without them on January
7, 2004 and failed to provide EG's school records to them as
required and requested.  The hearing officer rejected these
claims, finding no procedural violations of any kind.  Upon
review of the record, I agree with his assessment.

Parents have a right to participate in the IEP process.
Roland M., 910 F.2d at 994.  If their allegations of exclusion
are true, this could potentially be violation of the IDEA's
procedural requirements.  The District must provide a reasonable
opportunity for parental participation in IEP meetings, but may

conduct such meetings without parental participation if it is unable to convince a parent to attend and has made reasonable attempts to gain parental participation.  20 U.S.C. § 1414(d)(1)(B)(I); 34 C.F.R. § 300.345(d).

Here, the record shows that the District satisfied these obligations.  Plaintiffs attended the January 9, 2003 IEP development meeting and signed off on the IEP.  Then, after agreeing to the terms of the IEP, plaintiffs time and again neglected to attend team meetings of which they were informed and to which they were invited.  When they did attend meetings, Ms. K. often made sweeping and unqualified declarations of what she felt EG needed and refused to engaged in a dialogue with the District regarding EG's education.  Instead, she withdrew from the meetings and threatened immediate appeal to a Due Process hearing.  I conclude that the District made all reasonable efforts to secure plaintiffs' participation and reasonably proceeded without them in the best interests of EG.

As for requested documents, the District stated that it had complied with all document requests and requirements for documents in its possession.  A signed receipt dated June 17, 2003 reveals that EG's parent received a copy of her special

-33-

education file.  Testimony indicated that her file was also open
to plaintiffs for review at any time during regular business
hours and that plaintiffs had made not made any requests that
were denied.  Despite plaintiffs' unsupported allegations to the
contrary, I have no reason to disbelieve the District's
representation and thus affirm the hearing officer's ruling on
this matter.

### ii.  <u>Private Placement</u>

Plaintiffs also challenge the decision in Hearing Two
denying EG private placement.  Both at the hearing and now,
plantiffs unilaterally declared that EG required private
placement prior to the expiration of the agreed IEP.  EG's
parents insisted that she required an out-of-district placement
solely based on their own observations and opinions.  Ms. K.
testified that EG's work performance was on par for her grade
level during home-schooling, but that it declined once she
returned to public school.  Ms. K. offered no evidence that she
possesses any training or qualifications to accurately assess
EG's student performance.  She apparently based her opinion on
EG's answers to questions from typical 6th grade textbooks which

Ms. K. asked her.  The remainder of testimony presented by
plaintiffs failed to demonstrate the absence of FAPE at
Timberlane.  If anything, it bolstered the District's position
that EG's placement at Timberlane was adequate and appropriate.

     The District presented a thorough and convincing case on
both direct and cross examination describing EG's public school
experience, the manner in which the District implemented the IEP,
and statements by numerous teachers, counselors, and
administrators that EG continued to make progress at Timberlane.
Additionally, the District elicited credible testimony that EG's
health needs could be better served at public school than at LSA.
In light of the strong evidence supporting the District's ability
to implement EG's IEP at the time, and the relative dearth of
evidence to the contrary, I will not disturb the hearing
officer's decision.

     Lastly, I see no evidence, as plaintiffs contend, that the
District penalized EG for medical absences or inappropriately
marked her absent or reduced her grades as a result.  More
supportable is a contrary conclusion — which the hearing officer
observed — that the plaintiffs were "deliberately hindering
Student's participation in the educational program."  (Vol. 12,

-35-

p. M27094).

**D.   <u>Hearing Three</u>**

In Hearing Three, the hearing officer dismissed all but one of plaintiffs' claims under the principles of res judicata and collateral estoppel, and dismissed the remaining claim as seeking an improper remedy (compensatory education) for the violation alleged (testing without parental consent).  Because I can make out no specific identifiable argument in plaintiffs' Decision Memorandum with respect to Hearing Three, I will assume they challenge the final judgments.

"The doctrine [of res judicata] precludes litigation in a later case of matters actually litigated, and matters that could have been litigated, in the earlier action."  <u>Torromeo v. Town of Fremont, N.H.</u>, 438 F.3d 113, 116 (1st Cir. 2006).  The elements of a res judicata defense are: "(1) a final judgment on the merits in an earlier proceeding, (2) sufficient identicality between the causes of action asserted in the earlier and later suits, and (3) sufficient identicality between the parties in the two actions."  <u>Breneman v. United States</u>, 381 F.3d 33, 38 (1st Cir. 2004).  Although, as the hearing officer observed,

plaintiffs sought to rewrite numerous allegations to restate their case, they cannot avoid the res judicata bar.  Hearings One and Two involved the same parties, same issue (private placement and IEP implementation), and final judgments.  Accordingly, the officer properly barred relitigation of the same in the hearing.

Additionally, I agree with the hearing officer's dismissal of plaintiffs' request for compensatory education.  Compensatory education is relief awarded under the IDEA to remedy past violations.  See Phil v. Mass. Dep't. of Educ., 9 F.3d 184, 188 (1st Cir. 1993).  Here, I see no violation by the District where the IEP required no prior consent to test EG, nor do I believe compensatory education would be the proper remedy for the alleged violation.

**E.**    **Hearing Four**

Plaintiffs also challenge the decision in Hearing Four to approve the District's proposed IEP for the 2004–05 school year. Because plaintiffs' appeal of Hearing Four was untimely, I hold that it is barred by the statute of limitations.

A party appealing a final administrative decision in a special education due process hearing pursuant IDEA must do so

within 120 days of receipt of the decision.  N.H. Rev. Stat. Ann.
§ 186-C:16-b(IV).  On May 21, 2004, the hearing officer issued
his decision in Hearing Four.  (Vol. 10, pp. 47000-04).  The
District received this decision on May 25, 2004. (Doc. No. 23,
Def.'s Answer to Amended Complaint at 42-43).  The 120-day
statute of limitations for appealing the Hearing Four decision
thus expired on September 23, 2004.  On September 16 (Doc. No. 7
at ¶¶ 3-4) and November 18, 2004 (Doc. No. 20 at 5), plaintiffs
acknowledged to this court that they had not previously appealed
the Hearing Four decision, but that they intended to amend their
complaint to add such an appeal.  It was not until December 21,
2004, however, that plaintiffs actually filed an Amended
Complaint, including for the first time their appeal of the
Hearing Four decision.  (Doc. No. 19).  Despite their prior
"intent" to appeal Hearing Four, they failed to do so within the
requisite statute of limitations.

     In some cases, a claim asserted in an amended complaint may
"relate back" to the date of the original pleading.  Fed. R. Civ.
P. 15(c).  In order to do so, the new claim must arise out of the
same conduct, transaction, or occurrence set forth in the
original pleading.  Id.  Here, plaintiffs filed their original

-38-

complaint on May 18, 2004 (Doc. No. 1), appealing the final decisions rendered in Hearings One, Two, and Three.  Because Hearing Four had not yet occurred, I conclude that it did not arise out of the same conduct, transaction, or occurrence as the original complaint, and thus may not relate back.

Finally, I decline to apply the doctrine of equitable tolling here.  Under that doctrine, I may toll the statute of limitations "if a plaintiff, in the exercise of reasonable diligence, could not have discovered information essential to the suit."  Gonzalez v. U.S., 284 F.3d 281, 291 (1st Cir. 2002). Equitable tolling is "appropriate only when the circumstances that cause a plaintiff to miss a filing deadline are out of his hands."  Id. (citations and internal quotations omitted). Plaintiffs offer no explanation why they failed to appeal this decision within the statute of limitations.  Absent some showing that this missed deadline was "out of their hands" I decline to equitably toll the limitations period.

### IV.   CONCLUSION

For the reasons stated above, I affirm the decisions of the

hearing officers and find that the District complied with the

procedural requirements of the IDEA and provided EG with FAPE at

all relevant periods.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

January 4, 2007

cc:  Mr. G., pro se
     Ms. K., pro se
     Jeanne M. Kincaid, Esq.